## HENDERSON *v.* WILLIAMS.

| | |
|---|---|
| 66 | 405 |
| 68 | 197 |
| 68 | 536 |
| 68 | 565 |
| 66 | 405 |
| 69 | 272 |
| 66 | 405 |
| 70 | 7 |
| 70 | 386 |
| 66 | 405 |
| 71 | 106 |
| 71 | 108 |
| 71 | 350 |

A servant assumes the perils incident to his service of which he is informed, or which ordinary care would disclose to him.

His master's failure to inform him of facts immaterial to his safety is not negligence.

CASE, to recover for injuries sustained by the plaintiff, October 5, 1886, in the defendant's quarry in Francestown. Verdict for the plaintiff.

While the plaintiff, as the defendant's servant, was engaged in removing an unexploded charge of powder by him placed in a hole previously drilled by him and others, the charge exploded, whereby he was injured. The plaintiff claimed that the fuse used by him to ignite the charge was, without his knowledge, defective in that it had been wet; that by order of the defendant's superintendent, who had charge of the blasting materials and who knew of its condition, the fuse was placed in the defendant's powder-house, where the plaintiff was instructed and accustomed to get materials for blasting; that it was thence taken by the plaintiff and used in loading the hole, and that by reason of its having been wet he was blown up and injured. He further claimed, that wet fuse may be good in parts, and that to drill out a charge by the side of fuse that may at some point be filled with undamaged powder is more hazardous than to drill down by a burned-out fuse; that the plaintiff, not knowing that the fuse had failed to burn throughout its length, was led by this want of knowledge to presume that there was no danger of an explosion unless sparks from his tools came in direct contact with the charge, and that so he was exposed to unusual and unexpected danger.

At the close of the plaintiff's testimony the defendant moved for a nonsuit, and at the close of all the evidence that the court order a verdict in his favor. The motions were denied, and the defendant excepted.

*Sulloway & Topliff, J. F. Briggs,* and *O. E. Branch,* for the defendant.

*George B. French* and *C. H. Burns,* for the plaintiff. On a motion for nonsuit, or to order a verdict for the defendant, the rule is well settled that where lack of evidence is set up the court shall not weigh the evidence *pro* and *con* and measure the credibility of witnesses, but shall look at the evidence adduced in favor of the plaintiff's allegations, by both sides, in the most favorable light that the jury could have regarded it, and treat the remaining evidence as out of the case. Adverse testimony, coming even from one of the plaintiff's own witnesses, will not be assumed to be true when denied by the plaintiff. *Smith* v. *Lucas,* 53 N. H. 568.

All testimony furnished by the defendant favorable to the plaintiff, after the denial of the motion for a nonsuit, will be added to the plaintiff's own testimony. Abbott's Trial Brief, "Civil Jury Trials," p. 123, par. 14; Fairfax v. Railroad, 40 N. Y. Super. Ct. 128; Myers v. Dixon, 45 How. Pr. 48.

"All disputed facts are to be decided in favor of the plaintiff, and all presumptions and inferences which the plaintiff has a right to ask from the jury are to be conceded to him." "Upon the motion the plaintiff is entitled to have the evidence taken as true, and also to have every intendment and fair and legitimate inference and presumption taken in his favor." Cook v. Railroad, 1 Abb. N. Y. App. 432; Maynes v. Atwater, 88 Pa. St. 496; Walker v. Supple, 54 Ga. 178, 180; Frost v. Gibson, 59 Ga. 600, 602; Bevan v. Ins. Co., 9 W. & S. 187; Parks v. Ross, 11 How. 373; Purcell v. English, 86 Ind. 34; Pratt v. Stone, 10 Bradw. 633; Bishops v. McNary, 2 B. Mon. 132; Gallatin v. Bradford, 1 Bibb 209; Stone v. Railway, 47 Iowa 82; Elwood v. Western Union Tel. Co., 45 N. Y. 549; Hackford v. Railroad, 53 N. Y. 654; Smith v. Coe, 55 N. Y. 678; Heyne v. Blair, 62 N. Y. 19; Pillsbury v. Pillsbury, 20 N. H. 90; Fletcher v. Thompson, 55 N. H. 308; Libbey v. Pierce, 47 N. H. 309; Oakes v. Thornton, 28 N. H. 44; State v. Hodge, 50 N. H. 524, 525; Stearns v. Wright, 51 N. H. 612; State v. Manchester & Lawrence Railroad, 52 N. H. 563; Tuttle v. Farmington, 58 N. H. 13; Griffin v. Auburn, 58 N. H. 121; Paine v. Railway, 58 N. H. 611.

It is only where inferences are certain and uncontrovertible that the case may be decided as one of law by the court. Stark v. Lancaster, 57 N. H. 94, 98; Thurber v. Railroad, 60 N. Y. 326, 331; Dolfinger v. Fishback, 12 Bush 475; Stone v. Railway, 47 Iowa 82.

The defendant shall answer for the natural and probable consequences of his voluntary acts, and his acts are the acts of those deputed to discharge his duties in furnishing materials. Whatever results spring from the ordinary operation of physical laws are "natural and probable," unless we lose sight of the word ordinary, and embrace those sudden and surprising aggregations or freaks of force whose outcome is known in law as the "act of God." There was nothing that occurred in the terrible calamity which befell the plaintiff but what was directly traceable to the voluntary acts of the defendant's superintendent, having in his keeping the discharge of the defendant's duty to furnish proper materials, materials that should tell the truth, and be what they purported to be and what could be anticipated in the operation of the obvious laws of nature under circumstances attributable for their existence to those voluntary acts.

The testimony of the defendant, Nelson T. Wheelock, the plaintiff, and others, shows that Nelson T. Wheelock had charge at the quarry, and furnished the powder and fuse. He was the superintendent, and in his absence Sylvester acted as such. On the day

of the accident Wheelock had gone away, and Sylvester was in charge according to his duty. From the plaintiff's testimony and others', we learn that Sylvester ordered the plaintiff and Morrill to remove this unexploded charge after it refused to go, while Sylvester and another workman removed the smaller charge close by which did not go. We learn from the plaintiff, that there was nothing about the fuse, which burned down to a crisp till out of sight, to warn him that its imperfections caused the failure to explode. We learn from all, that the occasional removal of unexploded charges was a duty discharged by the help when directed to do so. We learn from Nelson T. Wheelock, that the failure is sometimes due to imperfect connection of fuse with powder, or to the cutting of the fuse in tamping, or pulling it out of the powder, and to a variety of things, so that a reasonable man might infer any one of these things as the cause, according as his absence of knowledge of a cause in one direction and his presumption of a perfect condition of things there might turn his attention elsewhere.

The plaintiff's work was assigned to him that day definitely; and if it had not been, it would have been in the line of usual practice for him to do it. We learn, from the plaintiff and others, that there was a powder-house for the quarry where the plaintiff and others who had occasion to use powder and fuse on the quarry were accustomed to go, without special request or permission, and get powder and fuse. We learn from Wheelock that the stock of powder and fuse was provided by him in behalf of the defendant, as his agent. Without special notice to the contrary, the plaintiff had a clear right to presume that when he went to the powder-house for supplies to enable him to discharge his duty, he would find there proper materials,—materials having no hidden and unknown danger beyond that ordinarily possessed by them. He had a right to presume that in loading or unloading, when using such materials, he would need to follow only the ordinary course.

Wheelock and Gozeau both testified that fuse more or less wet had been placed in this powder-house, not many days before the accident, by the order of the superintendent, Wheelock, and no one pretended that it had been removed from there before the day of the accident. It was also shown that wet fuse is not regarded as fit for general use in charging holes, as would be apparent to the common understanding. The extent to which it had been wet, and how it was affected in appearance, were in controversy. Morrill testified that it remained in the water long enough for a scuffle to go on, before it was picked up and placed on a shelf of rock. Gozeau, a witness for the defendant, testified that this very fuse was used in these holes. The evidence stands upon the testimony of the plaintiff and John Morrill that the fuse looked natural and gave them no warning of its unfitness, and also upon the conduct of Sylvester in allowing it to be used, as well as the improbabilities of its use if apparently unfit. Experiments, in

the presence of the jury, with fuse placed in water for a long time, and testimony as to some so placed when the jury were not present, and the attempts of witnesses on the stand to distinguish one from the other by appearances, aided the jury in accepting or rejecting the plaintiff's evidence on that point.   Here was evidence tending to show that the plaintiff had no notice, and the plaintiff so testified, and therefore, on the motions, it stands proven that he had no notice that the fuse had been wet.

So far we have the voluntary act and order of the defendant's agent whereby the wet fuse went to the powder-house, and by natural sequence came to the hand of the plaintiff, and was used. There is no remoteness here, no act of any outsider, and no "act of God."   That the fuse which the jury saw float might be injured in part by water and be sound in places was testified to, and was a matter of common knowledge or inference, as also that it might burn part way towards the powder and then stop by reason of coming to a wet and spoiled place.   Possessed of the information of Wheelock, the plaintiff could easily have deduced the cause of the failure to explode.   Here was where he lacked a fact vital to his safety, a fact which would govern his conduct, and it was withheld by the superintendent.·  Without any knowledge of imperfection in the fuse, and with other ways, suggested in the testimony of Wheelock, for accounting for the failure to explode, the plaintiff was not in fault for not attributing it to something presumed to be perfect, and the defendant was in fault for denying that information, which would have solved the difficulty at once and saved the calamity.

The testimony of the plaintiff was, that he used water abundantly, and "mudded," that is, removed the tamping, as often as his drill grew sticky; that he pursued the usual course as to water, and had reached within from eight to ten inches of the charge of powder; and that it was customary to go within three or four inches before digging out the balance with a spoon.   Whether in all these particulars and some others the plaintiff was in the exercise of due care was purely a question of fact for the jury.   There is no admitted negligence, and there is no test of negligence known to our law.   The claim of the defendant was, that the drill which was used in getting out tamping had reached clear down to the charge, and thus, by the carelessness of the plaintiff, exploded the charge with a spark.   But we must accept the testimony of the plaintiff on this point; and if any corroboration were needed upon these motions, there would be a plenty in the testimony of the defendant's witnesses,—Osgood, Butterfield, and others,—that with the tamping all out, or no more than four or five inches left, the powder would "blow out," and not show the full force of a confined charge, as in this case throwing off tons of rock, and splitting the ledge to the bottom of the hole, as testified to by John Shattuck.   The powder was ordinary powder, and, as everybody knows,

is only exploded by a spark or heat.   That spark must have come from the fuse.   These were matters for the jury, and with from eight to ten inches of tamping above the powder there could be but one intelligent conclusion.   The jury had every reason to find that this wet fuse had not only the end first ignited, which burned to a crisp, as the plaintiff testified, out of sight, sound, but beyond the wet place where it "hung fire" was more dry fuse and good powder ready for the spark struck from the "bull head" of flinty hardness; and upon the presence or absence of that dry and perfect place in the fuse hung the fate of the plaintiff.   The plaintiff was not warned, and had no reason, when he saw the crisp end of the fuse at the mouth of the hole, to suppose that he was about to work a steel drill for eighteen inches, more or less, along the track of a fuse which at any moment might expose to a spark from the drill the same dangerous explosive which would greet him twenty inches from the top, and against which he could guard his life by using a spoon as he approached the border limit.   Without knowledge of this live and perfect powder along this track down to the charge, he could take no unusual precaution.   Had he known the fuse had been wet, the most obvious conclusion, after seeing that the upper end had burned to a crisp, would be to presume other perfect places in the fuse and points of danger.   Here was the extra hazard which the defendant's superintendent, by a perfectly natural and probable sequence, brought upon him, and here arose the fault of the defendant, springing naturally and speedily from ordering that wet fuse placed in the powder-house.

The workman had a right to rely upon the master's having done his duty in furnishing safe materials.   It was not a danger ordinarily incident to the work, and patent, that the master should furnish unfit materials.   If he did, the servant had a right to know of it.   When the accident of non-explosion came, it might arise from several causes.   The servant was not bound to assume any one of those causes, contrary to the instruction of his senses and his reliance upon the master's discharge of duty.   It was for the master to recognize the servant's reliance upon him to discharge his duty; and when he could see that the wet fuse would be likely to pass for good fuse and deceive the servant, it became his duty to avoid that deception because the danger would not be patent.   He had no right to anticipate, as a reasonable man, that the servant would distrust his senses and the master too, and fully appreciate the danger.   If the master, from what had usually happened in the case of servants, might reasonably expect that when the accident of non-explosion came the plaintiff would assist in the removal of the charge, he had no right to suppose that the plaintiff would distrust the instructions of his senses and excuse the master from his duty, and do what no reasonable man will do,— engage in the work with no reference to or care for the extent of the danger.   The convictions of the servant's senses might reason-

ably be expected to be strengthened by some reliance on the master's discharge of duty.

It seems to be assumed that servants on quarries, including the plaintiff, whenever the accidents of non-explosion came, drilled out charges without knowing as well as they could from the circumstances the extent of the danger, and that they did not on each occasion enjoy the alternative of going forward or not as they willed; that by their conduct in going forward they had renounced the right to have such information as the master possessed relative to the extent of the danger, and that the master therefore could treat the information as immaterial. Now the drilling out of charges was not the ordinary work for which the plaintiff, or any fellow-servant, was engaged. It was the result of aborted work, and was like the work of restoring a train to the track after it has run off. Trains run off, but it is accidental and exceptional, although in the case of an extensive system of roads it often happens in the aggregate. Danger to the extent that it was patent, in this very case, was all the plaintiff undertook to encounter.

"An employé who undertakes the performance of hazardous duties, assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which he has opportunity to ascertain." Whar. Neg., s. 214.

In the case at bar it might be a danger incident to the service, that, from imperfect execution of the servant's work or a fellow-servant's work, aborted results would come, as non-explosion. It might be an incident to the work that the servant would cut the fuse with his tamping-iron. It might be an incident to the work that the servant would fail to get the fuse into the powder, or that water would spoil the charge by weeping in. It would not be an incident to the work, which the plaintiff could not complain of at law, that the master should furnish wet fuse or imperfect fuse, and fail to inform the servant thereof. If such a case ever occurred on the quarry, it would not furnish a precedent for the future and allow the master to omit a duty well recognized in law. The least that could be said, if that could be said, would be, that the servant would have to be informed of that practice of the master of disregarding a duty, and have the servant consent to future disregard. It does not appear that the plaintiff ever heard or knew that charges failed to go because the master allowed wet or poor fuse to be used, and if he had, the burden was on the defendant to show it. Although superintendents on quarries testified to wet or poor fuse being a cause of non-explosions, it did not appear that the plaintiff knew of such a cause, or that he had any personal knowledge of the particular facts connected with more than one explosion before.

The court cannot infer knowledge on the plaintiff's part of all the causes of non-explosions merely because superintendents of many years' connection with quarries can assign the causes. They

might as well infer that the plaintiff had a personal connection with a great many cases of non-explosion and extraction of charges, contrary to the evidence that he had extracted but one before, and that where the charge was wet. It did not appear that wet fuse was used in charges if the servant knew it was wet. They all said it was not fit for use. It was not an incident of the service that wet fuse should be furnished or be used, nor was the plaintiff, as we have said, shown to have known that it was either an incident to furnish or use it, or that it was a cause of any non-explosions that he had met with or known of. The servant, then, as incidents of the service, if he chose to extract charges when ordered to, would encounter the cutting of the fuse in tamping, the wet charge, and the failure of fuse to reach the charge securely, as causes of non-explosion not attributable to the fault of the master, but to servants or to circumstances not controlled by the master. Those being the only causes of non-explosion for which the master would not be in fault for the miscarriage of the work, there would be as incidents of the work two causes of miscarriage that would place the danger of extracting the charge within that distance from the charge where the spoon was to be used, and one that would place it where wet fuse might also place it, thus giving the laborer two chances in three of being safe by employing the method pursued by the plaintiff, provided he was evenly balanced in his mind as to the probability of either cause producing non-explosion. To undertake to encounter the risks incident to work resulting from causes open and obvious, which causes the laborer has had opportunity to ascertain, does not embrace risks resulting from causes which spring from the master's negligence, and which the laborer supposed did not exist in view of what he had seen and experienced.

It was a material thing to the plaintiff to know why it had failed, because he could therefrom deduce what to expect. If the fuse had burned its entire length, but its length was insufficient to reach the powder from being pulled out while loading, then there would be nothing but charred and burned material where once was good fuse, and in moving a drill through that tract of the hole no dangerous explosion would be expected. But if the plaintiff had known that the fuse had been wet, the conclusion would have been obvious, in the absence of any information of any other cause, that it had stopped burning at some place short of the charge where the moisture had affected the powder. There would have been some direct evidence upon which to base that conclusion, and nothing but what had sometimes happened upon which to base a different conclusion. And another conclusion would have been reasonable, that, if the fuse was good enough to burn to a char into the hole and out of sight, it might be good enough somewhere beyond the damaged place to ignite and burn to a char until it exploded the charge. Having stopped burning at some unknown

point, neither the plaintiff nor any one else, if possessed of that fact, could tell the condition of things further down, and so ignorance of "why it had failed" was a most dangerous situation and far from immaterial.

The plaintiff has nowhere argued that the failure to explode injured his body; but he says, what the jury must have found, that the failure of the defendant to inform him that he was likely to get hold of wet fuse in the powder-house, and his ignorance that he had got hold of it, and that this was the cause of the non-explosion of this charge, misled him to the reasonable conclusion that all was safe along the course of the charred and consumed fuse until close to the powder of the charge. Wet fuse is a harmless thing if not used; but wet fuse furnished to be used as this was, being placed where it would naturally come to the hands of the plaintiff for use, with ignorance on the part of the plaintiff of its state, leads naturally to non-explosion, and to the mistaken conclusion of the plaintiff that all was charred fuse and safe to the neighborhood of the charge.

There is enough in the defendant's conduct in putting by natural sequence into the plaintiff's hands a fuse which was imperfect when it seemed to be all right. When that fuse failed to explode the charge, neither Sylvester, who acted for the defendant and who may have heard what the workmen said on the bank, nor Wheelock put the plaintiff in possession of the knowledge that would have enabled him to foresee that the fuse had not burned to a crisp its entire length, and that beyond the place where it stopped, no knowing how close or how far off, was more good fuse that would also take fire and burn to a crisp.

The witnesses were before the jury, and their appearance while testifying, the character of the testimony which they gave, and all the facts connected with the trial, the arguments of the counsel, the charge of the court, were sufficient, in their opinion, to justify them in the conclusion to which they came. The jury, as a matter of fact, concluded that the defendant did not furnish the plaintiff with proper material to enable him to do the defendant's work safely. They concluded that the fuse which had been wet, and according to all the testimony in the case was therefore defective, was placed in the powder-house with the knowledge, and by the direction or by the act, of the defendant's superintendent. It was placed in the depository where only safe material was understood by the help to be placed. They concluded, from the testimony, that the plaintiff did not know that this fuse was defective; that there was nothing about it to indicate its defective character; that he was not negligent in taking it and using it in the manner in which he did; that when it failed to ignite the charge, the plaintiff had the right to conclude that it had spent itself its entire length; and that he was justified, in the exercise of reasonable care, to proceed to drill out the hole in the manner in which he

did. They concluded, from the testimony in the case, that, in drilling out the hole, without any fault on his part, his drill struck live fuse and burned eight or nine inches, reaching the charge and causing the explosion. They found this from the various facts which were presented to them on the stand, among them being the fact that there was a sufficient amount of tamping on the top of the charge to make it a very effective charge. These facts and circumstances, together with others which appeared in the progress of the trial, showed, as the jury thought, that the defendant was guilty of neglect, and that the plaintiff was without fault which contributed to the accident; and they returned a verdict accordingly.

CARPENTER, J. A servant assumes the perils incident to his service of which he is informed, or which ordinary care would disclose to him. *Fifield* v. *Railroad*, 42 N. H. 225, 240; *Nash* v. *Company*, 62 N. H. 406, 408.

The evidence tends to show—and at the trial it was apparently not disputed—that the failure of a charge to explode was not uncommon, and might happen from various causes, as from a wetting of the fuse either before or after it was put in position, from a defect in its manufacture, from its severance in the process of tamping, or by reason of its not extending to the charge; that from whatever cause the failure happened, the usual and ordinary course of proceeding was to extract the charge in the method pursued by the plaintiff, with which he was familiar.

The plaintiff did not know the cause of the non-explosion;—it might be, so far as he knew, a cut of the fuse in tamping, or a defect in its manufacture, either of which would render the removal of the charge as dangerous, and require as much care in extracting it, as if the cause were known to be a wet fuse. He stands no better than he would if the defendant had personally prepared the charge with wet fuse, and on its failure to explode had directed the plaintiff to drill it out without informing him that the fuse was wet.

There was no evidence tending to show that wet fuse is objectionable for any reason except that it may fail to ignite the charge; that it is more dangerous to extract a charge which from wetness of the fuse has failed to explode, than one which has failed by reason of a severance of the fuse in tamping, or a defect in its manufacture; or that knowledge of the wetness would in the slightest degree affect the method of extraction required when the cause of the non-explosion is unknown. If the fact was immaterial; if the plaintiff's action could not be affected by his knowledge or ignorance of it; if ordinary care required the charge to be extracted in precisely the same manner whether the cause of its failure to explode was known to be a wet fuse or was unknown,— the plaintiff's injury is not attributable to negligence of the de-

fendant. He was not in fault for not communicating a fact which was immaterial to the plaintiff's safety.

There being no evidence tending to show that the plaintiff was-ignorant of any fact material to his safety, the verdict must be set. aside.

*Exceptions sustained.*

BLODGETT, J., did not sit: the others concurred.