Merrimack, )
June, 1896. )

HARDY, *Adm'r, v.* BOSTON & MAINE RAILROAD.

In an action against a railroad company for injuries to a freight brakeman
   by an overhead bridge, the timbers of which were six inches lower than
   the lowest portion of the bridge guard, a motion for a nonsuit was prop-
   erly denied in the absence of conclusive evidence that the deceased knew
   or ought to have known of the difference in elevation, and when there was
   evidence to warrant a finding that he mounted the car before reaching the
   guard, upon which he relied for warning, and was injured because of its
   failure to notify him of his proximity to the bridge.

CASE, for injuries to the plaintiff's intestate caused by the de-
fendants' negligence. Trial by jury and verdict for the plaintiff.
At the close of the plaintiff's evidence the defendants moved
for a nonsuit; and at the close of the evidence on both sides
they moved that a verdict be directed in their favor. Both mo-
tions were denied, subject to their exception.

The evidence tended to prove the following facts: The de-
ceased, William H. Hardy, was employed by the defendants as
head brakeman upon a freight train running over the Concord
& Claremont road. He was thirty-three years old, five feet and
eight inches tall, in good health, and had a common school and
academic education. He had been employed upon railroads
fifteen or sixteen years, a good share of the time as brakeman.
He was an active, intelligent, and capable brakeman. At the
time of his employment by the defendants, there was a highway
bridge over the railroad near the Mast Yard station in Con-
cord, which rested upon abutments at the sides of the railroad,
about sixteen feet apart. The under surface of its timbers was
about fourteen and a half feet above the top surface of the rails,
making a space underneath for the passage of trains, about six-
teen feet wide and fourteen and a half feet high. Freight trains
passing there were composed, in part, of box cars varying in
height from eleven to fourteen feet above the rails, making the
free space between the tops of the cars and the bridge to vary from
a few inches to three and a half feet. At a distance of 125 feet
easterly of the bridge there was a bridge guard, consisting of an
arm extending across the track from a post at one side, with wires
about five feet long and eight inches apart hanging from it,—
their lower ends being fifteen feet above the track, or six inches
higher than the under surface of the bridge timbers. Fifty or a
hundred rods westerly of the bridge there was a spur track, con-
nected with the main line by a switch at its easterly end. This
was the lowest bridge upon the line, and the only one located so

near a spur track. No change was made in these conditions after the last employment of the deceased.

Some eleven years prior to his injury, the deceased worked upon this railroad as spare brakeman for a short time. The bridge was then substantially the same as at the time of his last service. It did not appear whether it was then protected by bridge guards, nor whether the spur track was there. After his last employment, he worked about six weeks, making about eighteen trips each way over the road. On nearly every trip in the westerly direction the trainmen set cars from the train upon the spur track. On these occasions it was the duty of the deceased to inform the engineer what was to be done, and when the train was sufficiently near the siding to go upon one or more cars at the head of the train and set the brakes,— thereby reducing the speed of such cars and bringing the rear cars against them, and enabling the rear brakeman to pull the connecting pins at the desired points. Sometimes the deceased assisted in pulling the pins, and sometimes he set the switch for the admission of the cars to the siding. After the pins were pulled, the forward end of the train went by the switch at an increased speed, the switch was set, and the disconnected cars, following at a slower speed, went upon the spur track. This duty must be performed near the bridge. It was easier to do the work if it was commenced at a considerable distance from the siding; and if the rails were wet, it was necessary to begin at a greater distance than if they were dry. The deceased sometimes went upon the cars before reaching the bridge, and sometimes afterward. He had been seen to ride under the bridge on the top of a car in a stooping posture, and also in a sitting posture. He knew that the trains were made up of cars of different heights. He received his injury upon a westward trip on the morning of August 1, 1892. It was misty or rainy at the time, causing the smoke to settle over the train and the rails to be wet. He went to the locomotive sometime before arriving at the bridge, and informed the engineer that two cars were to be set upon the spur track, and two more upon a side track at the Mast Yard station. The train was running about fifteen miles an hour, or twenty-two feet a second. At some point within 1,575 feet of the bridge, he went back over the tender to the first car in the train — a box car about eleven feet high — to set brakes and assist in setting out the cars. The only witness called by the plaintiff, who saw Hardy after he started back and before his injury, was the fireman. He testified, in substance, that he had no doubt they had come in sight of the bridge,— that is, within 975 feet of it,— when Hardy started from the engine to go back; that he was leaning out the cab window looking to the rear of the train for

signals; that he got a glimpse of Hardy as he passed over the tender and jumped on to the end of the next car; that just as he went on to the car they went under the bridge, and the smoke hid him from view; that when they got out from under the smoke he saw Hardy's hat going in the air and an outline of his heels, or something; that he then drew his head in and looked over the tender and saw Hardy lying upon the car; that he went to him and found him lying lengthwise of the car, apparently dead, with his head toward the engine and a little nearer to the forward end than to the middle of the car; that he thought Hardy had got both feet on the top of the car before he was hit, but, on account of the smoke, could not see whether he straightened up or not; that it was only a matter of seconds between the time when he saw Hardy in the act of jumping on to the car and the time they went under the bridge; that he did not know whether it was between the bridge guard and the bridge where Hardy got on the car, but from the speed they were going he thought it might have been before he reached the guard. The plaintiff's evidence also tended to show that the bridge struck Hardy's head about three inches below the top. To produce this result, the body must have been bent so as to reduce its height to about three feet and nine inches.

*Almon F. Burbank* and *George B. French*, for the plaintiff.

*Frank N. Parsons* (with whom were *Joseph W. Fellows* and *Edward B. S. Sanborn*), for the defendants.

I. The plaintiff's intestate by entering the employ of the defendants as a freight brakeman assumed the perils incident to such service of which he was informed, or which ordinary care would have disclosed to him. *Henderson* v. *Williams*, 66 N. H. 405; *Fifield* v. *Railroad*, 42 N. H. 225; *Nash* v. *Company*, 62 N. H. 406; *Bancroft* v. *Railroad*, 67 N. H. 466, and cases cited. "It was implied in his contract that he assumed the apparent risks as well as those generally incident and ordinarily and reasonably to be expected in the service, and that he would bear the special perils which he knew actually to exist in his particular employment." *Casey* v. *Railway*, *ante*, *p.* 162.

II. It was admitted that the bridge, by reason of which the plaintiff was injured, was not reasonably suitable for the safety of the employees of the road, and the defendants did not claim at the trial that the bridge was what it should be. This left as the only question in the case, whether the risk of injury therefrom in the course of his employment was assumed by the deceased. This would depend upon the following: (1) Was the dangerous character of the bridge actually known to the de-

ceased? (2) Was the risk from it an obvious one which he must be assumed to have known? (3) Was the danger from such a bridge a risk ordinarily incident to the employment? An affirmative answer to any one of these propositions is fatal to the plaintiff's case. It was incumbent upon the plaintiff to establish by evidence before the jury the negative of each of these propositions. The law was correctly stated in the instructions of the court to the jury; the error consisted in submitting issues to the jury upon which there was no evidence to warrant a finding favorable to the plaintiff. The defendants' motion for a nonsuit and a verdict should have been allowed.

All the evidence tended to prove that the deceased knew and understood the dangerous character of the bridge, and there was no evidence tending to prove the contrary and no question to be submitted to the jury upon this point. It appeared from the testimony of all the plaintiff's witnesses that Hardy's duties required him to go over the top of the train and to be there for the purpose of setting brakes, or other work in connection with running cars on to the spur track, at some point near the bridge; that this was of daily occurrence; and that his custom was to go forward to the engine, make arrangements about setting out these cars, and when near the bridge, either just before or just after passing it, to climb back upon the train for the performance of his duties in this operation. It appeared from the evidence that the bridge was fourteen feet four inches to fourteen feet six inches above the rail, and the car was finally established to be eleven feet one inch in height and was the next car to the engine. The accident happened in daylight. Hardy started back from the engine over the tender and climbed on to the next car and was struck by the bridge, the bridge being in sight when he started back from the engine. The evidence as to Hardy's experience, knowledge, and understanding of the character of the bridge and danger likely to result therefrom was uncontradicted and undisputed. There was nothing in the case upon which the jury could have found Hardy did not know the danger. The river bridge through which the train passed before reaching Horse hill bridge was distant therefrom 1,575 feet, the train was moving at a speed of fifteen miles an hour, or one mile in four minutes. Hardy with his knowledge of the road must have been notified by the passage through that bridge that the dangerous Horse hill bridge was less than one minute away.

Upon these facts and the law above cited, the plaintiff should have been nonsuited, and the error committed by denying the motion for a nonsuit should have been corrected by ordering a verdict for the defendants to which the defendants are now entitled.

III. The plaintiff offered no evidence of the height and condition of the guard at the time of the accident. Three months later, the last of October or first of November, the wires were fifteen feet above the rails. Hardy had the same means of information about the height and condition of the guard that the defendants had. What has been said in regard to Hardy's knowledge and means of knowledge of the character and position of the bridge applies as well to the guard or telltale. The court instructed the jury that the object of the guard is to warn the brakeman that he is approaching a bridge from which there is danger. In *Williamson* v. *Company*, 34 W. Va. 657, the court say: "As this unfortunate accident occurred in the daytime and not at night, I do not regard the question as to whether the guards or whipping strings were in proper order at the time the injury occurred as material, because the office of these guards is to give warning of the fact that a bridge is near when it cannot be seen." If Hardy had warning that he was approaching the bridge from other sources, it is immaterial whether he was warned by the guard or not. The plaintiff's evidence shows that when he went back over the tender he was in plain sight of the bridge and within a few seconds of it. His object in going back was to perform a duty which was invariably performed in the vicinity of this bridge, and in starting back at the particular time he did, shows that he had in mind that he was near the bridge. He had just passed through the Contoocook river bridge which must have given him warning that Horse hill bridge was less than one minute ahead. In this view, it is immaterial whether Hardy went upon the car before or after passing the guard and the court erred in submitting the question of the guard to the jury.

IV. Aside from the implied contract of assumption of risk by Hardy arising from the relation of master and servant, upon which we have already cited the authorities, and which is fatal to the plaintiff's case, the plaintiff cannot maintain his action upon the evidence, because there is no evidence from which the jury could find that Hardy was in the exercise of due care; in other words, Hardy was guilty of contributory negligence. In this case Hardy had full knowledge, warning, and notice of the obstruction, and deliberately exposed himself to the danger. And the same principle of law applies as in a traveler's highway suit where the traveler, with full notice of the danger, exposes himself thereto. *Gilman* v. *Deerfield*, 15 Gray 577; *Adams* v. *Carlisle*, 21 Pick. 146; *Farnum* v. *Concord*, 2 N. H. 392; *Norris* v. *Litchfield*, 35 N. H. 271; *Clark* v. *Barrington*, 41 N. H. 44; *Tucker* v. *Henniker*, 41 N. H. 317; *Winship* v. *Enfield*, 42 N. H. 197; *Underhill* v. *Manchester*, 45 N. H. 214; *Company* v. *Railroad*, 62 N. H. 159.

" In an action for negligence the question of due care is generally for the jury to determine; but when uncontroverted facts

show negligence on the part of the person injured the law requires the jury to return a verdict for the defendant." *Gahagan* v. *Railroad,* 1 Allen 187; *Wright* v. *Railroad,* 4 Allen 283; *Murch* v. *Railroad,* 29 N. H. 9; *State* v. *Railway,* 65 N. H. 663.

*Oliver E. Branch,* orally, for the defendants.

I. It is not contended, or at least it cannot be successfully, that upon the plaintiff's own evidence Hardy was not perfectly well aware of the existence of the bridge, its location, its proximity to Carpenter's side track, and its dangerous character. The only point upon which it is claimed that the defendants were negligent is that the wires of the telltale were six inches higher than the bottom of the bridge sill; and it is argued that this was negligence and constituted a defective telltale, because a telltale should be constructed so as to inform a brakeman, among other things, of the height of the bridge against which it is set to guard; that is, the ends of the wires should be on a level with the bridge sill, so as to indicate to the brakeman how much he must stoop in order to clear the bridge in safety.

No evidence was produced in support of that novel theory. It is doubtful if it were ever suggested by anybody or ever known among railroad men until counsel evolved it " in his library." The statement that the sole object of the guard or telltale was to notify him of his approach to the bridge, is an exact and complete statement of a well known fact. If it were understood to be the duty of a railroad to furnish some device by which a brakeman could be made aware of the precise height of an overhead bridge, and give him a gauge for determining how low he must stoop in order to clear it, nothing could be more unfit for the purpose, or better calculated to confuse and unsettle a brakeman's judgment, when applying it to that purpose, than a telltale. Imagine a brakeman on top of a car, passing a telltale at a speed of twenty-two feet per second or more, and made aware of its existence by the whip or stroke that it may give either in the face or on his back and head, undertaking to calculate during the intervening six seconds how far down on his body the extremity of the wires came, and from that computation trying to determine precisely how low he must stoop to clear the bridge. A brakeman undertaking to work out such a problem as that, and staking his life upon the accuracy of his computation, would be guilty of the grossest carelessness. The danger of an overhead bridge is something which a brakeman must not trifle with or speculate concerning. It is the duty of the railroad to furnish him with a guard that will give him reasonable notice of its proximity. It is not the duty of the railroad to furnish a guard that will enable him to enter into a nice computation for deter-

mining precisely how nearly erect he may stand upon a car and not be killed while passing under a bridge. Suppose on the morning of this disaster, the rear brakeman had been on this same car, and as it passed the telltale had said to Hardy, "There is the telltale," and notwithstanding that warning Hardy was killed : would counsel argue the liability of the defendants? Suppose there were no wires in it, only an arm, and the same remark had been made and the same accident had happened : would the defendants be liable ?   Suppose there were no telltale, and at a point 125 feet from the bridge Hardy had been warned by a fellow-servant that they were approaching the bridge, and notwithstanding the warning he was killed : would the defendants be liable ?   Suppose there had been no telltale, and that when Hardy left the engine, the engineer had said to him, "Look out now, we are coming to Horse hill bridge," and he had been killed : would it be claimed that he was ignorant of any fact which the defendants ought to have made known to him, which contributed to his death ?   And yet his conduct when he left the engine showed beyond question that he knew he was approaching the bridge as well as if he had been informed by the engineer. These illustrations are sufficient to show that the practical and legal necessity of a telltale is simply to warn a brakeman of the approach to a bridge, and that it is not designed or intended to furnish a brakeman with a basis for determining how near he may run to the line of danger and escape, or precisely how far he must stoop to be safe.

II.   What were the obvious perils incident to Hardy's employment ?   First, the overhead bridge, which was low; which he knew to be low ; which he knew was particularly dangerous, and a danger which he had learned to avoid.   He had passed it a number of times in safety, which he could not have done had he not been informed how to do so.   He had been seen to pass under it a number of times on top of a box car, and he knew it was at a point where he was accustomed to get out to do his work.   He knew he was approaching the switch because he started to perform the customary work at that switch, and he therefore knew that he was approaching the bridge.

Second, it was one of the obvious perils incident to his employment that he might in doing his work attempt to mount to the top of the car at some point between the telltale and the bridge. He knew, or he might have known if he had exercised his senses, where the telltale was.   At least, there is no evidence that he did not know.   The conclusive presumption is he did know, because it was obvious, and his former experience indicates that it had served as a warning to him before.   The chance that he might, in doing his work, undertake to climb on top of a box car while passing the telltale was apparent, and he assumed that risk.

Third, for the same reason, it was obvious that in doing his work and attempting to climb up the ladder of a box car, or in stepping upon the top, he might do so at the instant he passed the telltale so that it might not touch him.

Fourth, it was just as obvious a risk of his employment that when mounting to the top of a box car and while running along the top, or seeking to recover his balance while in a stooping posture, he might do so at the instant he passed the telltale and would be stooping too low to touch it.

Whatever the actual fact was, whether Hardy was between the bridge and the telltale when he undertook to climb upon the car, or whether he was climbing the ladder when he passed the telltale, or was just stepping upon the top of the car at that moment, or was running along in a stooping posture, or was stooping in an effort to recover his upright position, he was doing so in view of a perfectly obvious peril, to wit, that he might clear the wires. It is argued that if the wires had been six inches longer they would have touched him and warned him of his approach to the bridge. In answer to that we say there is no evidence they did not touch him. That is a mere speculation of counsel. But whether they touched him or not, it is clear that he did not rely upon the warning of the wires to inform him where the bridge was. Furthermore, there was no evidence that the telltale was not reasonably sufficient in length to warn him that he was approaching the bridge; that is, that it was not such a telltale as would strike a man of average size at work on top of a mixed train of cars under ordinary circumstances. It came within four feet of the top of this car. There was no evidence that it was not a sufficient guard.

III. There being no evidence that Hardy was not aware of his approach to the bridge, but on the contrary that he knew he was approaching it, that he knew the bridge was low and dangerous, and that the only way to avoid it was by stooping or lying down upon the car, and that he was stooping; and there being no evidence that the telltale did not in fact touch him as he passed under it, or that if it did not touch him he did not see it after he passed it, as he moved backward from it, with his face turned towards it, and no evidence that he relied upon it either to notify him where the bridge was or how low to stoop when he approached it, counsel is driven to assert the proposition that the jury might infer, from the fact that he was killed, that he was not informed of his peril. I do not understand this to be the law in New Hampshire. The doctrine *res ipsa loquitur* does not apply here. In *Paine* v. *Railway*, 58 N. H. 611, it was said: " Negligence is a fact for the plaintiff to prove by the preponderance of the evidence; a fact for the jury to find or not, without any presumption of law one way or the other. . . . The authorities are

numerous which hold that a mere scintilla of evidence is not sufficient, but there must be distinct affirmative evidence of the existence of negligence in order to sustain the burden of proof. . . . Judges are not required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence." In *Foss* v. *Baker*, 62 N. H. 249, it was held: "In an action by a servant against his master for injuries sustained in consequence of the latter's negligence, there is no presumption of negligence from the fact that the accident happened."

The fact that Hardy was killed proves nothing as to how the accident happened. It has no tendency to prove his ignorance of his immediate danger, because his death is "equally consistent" with a knowledge of his approach to the bridge and an error of judgment in stooping sufficiently low to safely pass. And because it is also "equally consistent" with the theory that he had just risen to the top of the car when he was struck. It constitutes no evidence of the defendants' negligence. If it did, then the whole doctrine that a master is bound to furnish his servant reasonable appliances for doing his work, and that a servant assumes the ordinary risk of his employment, would be swept away; and the mere fact of his death would be sufficient in any case to obtain a verdict against the master.

IV. Nor can Hardy's ignorance of the exact or relative height of the telltale and the bridge, or of his proximity to danger, be inferred upon the doctrine of the instinct of self-preservation. This doctrine is stated in *Huntress* v. *Railroad*, 66 N. H. 185, as follows: "In an action against a railway company by an administrator of a person killed by a train on a level highway crossing, when there is no evidence that the deceased was insane or intoxicated, or that he committed suicide, and no direct evidence on the question of his negligence, his exercise of ordinary care may be inferred from the instinct of self-preservation."

If the foregoing statement is a correct proposition of law, it would not be erroneous to charge a jury, that in the absence of all direct evidence of what the conduct of the deceased was when he was about to cross the defendants' track, they may infer (1) that he was exercising his senses of sight and hearing; (2) that he was governing his actions according to the intimation which his senses of sight and hearing gave him; (3) that he was restrained by what he saw and heard from incaution, negligence, or want of care; and (4) that he was controlled in what he did by a prudent judgment. This would be equivalent to saying to the jury that, notwithstanding there was absolutely no evidence of how the deceased acted, they may speculate upon

that question from the bare assumption that he did not want to die; and that their aggregate speculations and imaginings may be compressed into an established fact, the existence of which is disputed and the affirmative proof of which is absolutely essential to the plaintiff's recovery.

It will not be disputed that a jury may draw inferences. Indeed, a verdict of a jury is, in one aspect, no more than a final expression of the inferences which they have drawn from the evidence. But their inferences must be drawn from pre-established facts. They cannot infer a fact and then draw inferences from that inference. The error in the language quoted is in this, that it says in effect that a jury may assume certain things as proved, but which they really deduce by a process of abstract reasoning or speculation. A jury may take notice of generally recognized and well established facts of life, experience, and history; and included in them is the fact that every human being is possessed in a greater or less degree, and more or less instant and alert, of the instinct of self-preservation. But the further question is still open, and cannot be inferred from the mere fact that this instinct is existent, to wit: Did that instinct lead the deceased to act seasonably and with reasonable caution?

These facts cannot be said to be established by the existence of the prior conceded or recognized fact unless the court is prepared to go a step further and say to the jury that it is common knowledge that the instinct of self-preservation always leads all men at all times and under all circumstances to act promptly and prudently. Suppose at the trial the plaintiff's counsel should offer to show by witnesses what they would do if they were about to cross a railroad track under the circumstances of the case, and, upon objection, should say that the object of the evidence was to prove what the conduct of the deceased inferentially was, or might have been; I apprehend that such evidence would be promptly excluded. But, says the plaintiff's counsel, I offer this to show that mankind generally act in like situations in the same way, and therefore, it is competent for the purpose of establishing a basis from which the jury may infer how the deceased acted. Such evidence would be excluded because it would be immaterial how other men and all men may or might have acted, since the real question is, how the deceased himself did act. What difference is there, in principle, between the supposed case and the question under discussion? For the court to say that the exercise of ordinary care by the deceased may be inferred from the instinct of self-preservation, is precisely the same in principle and in effect as to admit evidence of witnesses to prove what they would do under like circumstances.

The inference that the deceased was exercising ordinary care

from the instinct of self-preservation cannot be drawn unless the court is prepared to say further that it operates universally, invariably, and certainly with all men under like circumstances, and leads them to do the same thing. If it does not so operate, then any conclusions of a jury based upon its existence are mere guesswork. The law as stated by the court assumes that the instinct always deters men from stepping into danger. Obviously, this is not true. Men are constantly doing things which at the moment they are perfectly conscious are hazardous, impelled thereto by the instinct or passion to take chances, to pit themselves against the forces of nature, and to stake their intelligence against matter. In a moment of peril every man has discerned within himself two forces warring against each other as visibly and consciously as Paul discerned them centuries ago. The instinct of self-preservation is known not to be at all times superior to man's will to control it, not stronger than his passion for chance to restrain it, not certain in its operations to correct his errors of judgment when the judgment must act instantly. It is no more certainly existent in the nature of some men than the instinct to sport with chance is in the nature of other men. But would the court say that the fact that the deceased acted imprudently and recklessly may be inferred from the instinct in man to take chances? If the conduct of the deceased may be inferred either way simply from the recognition of certain instincts which are common to the race, the necessity of proving what one actually does under the alleged circumstances of any case is dispensed with; so that if a man is indicted for larceny it may be inferred that, being where the stolen articles were, he did or did not take them according as the jury may determine whether his predatory instinct was more or less active than his moral sense. In any case for damages for the death of the plaintiff's intestate when crossing a railroad track, the negligence of the defendants' servants may be inferred from the fact that it is natural for some men to do things which are careless, and the prudent conduct of the deceased may be inferred from the existence of his instinct to take care of himself; and thus the whole matter of disputed fact and the conflicting testimony of witnesses may be disposed of by a simple process of deduction.

The language quoted is erroneous for the reason that it assumes that always whenever men are about to cross a railroad track the instinct of self-preservation is active, and so active that it controls their movements and controls them in a reasonably prudent manner; that it is never dormant or suspended, but is ever instant and alert. But is it not true, and within the experience of every one, that men are often so abstracted and preoccupied that they are unaware of peril until it is upon them? In such cases the instinct of self-preservation has not roused

them to a sense of their danger, and it urges them to action only when it is too late. It does not always forerun a man's actions to determine them, or break in upon his preoccupation to admonish him. It is a sentinel who sometimes sleeps at his post; a monitor who sometimes knocks ineffectually at the portal of consciousness. We deny that the instinct of self-preservation constitutes any basis or premise from which the inference of care can be deduced. What is meant precisely by the term " instinct of self-preservation "? It will not be contended that it is to be distinguished in any respect from all those faculties of the mind which are denominated instincts, and which by all the authorities in metaphysics are conceded to be distinguishable from the reasoning faculties. That they do exist is an established, evident fact. Whether they are the hereditary, transmitted, automatic efforts of the conscious being, which originally were deliberate and determined by the will, but which by long continued effort of the race have finally become automatic, like the acquired dexterity of the fingers; or whether they are simply the survival of the fittest, preserving actions which experience has demonstrated useful to the race, it is not necessary to establish in order to account for their existence. It may be assumed that whatever the origin of the instinctive faculties, and however subtle their manifestation and play, they are positively differentiated from the reasoning faculties. The instinct to close the eye when coming into a blinding light, to throw up the arm to ward off a blow, to dodge or duck the head to avoid a missile, to plunge forward or backward when enveloped in danger, or to halt on the verge of disaster, are not acts to which the will has consciously determined the body, but which are done without its suggestion or intervention.

Instinctive actions being distinguishable from those that follow a process of reasoning, it is manifest that the instinct of self-preservation furnishes no rational basis from which the jury may determine the disputed fact. The question is, did the deceased exercise ordinary care; and in defining what ordinary care is, the court would instruct the jury that it would be such care as a man of average prudence would exercise under like circumstances. That is, it is the care which his reason or his judgment admonish him to take. Suppose in charging the jury the court should say that the care which the deceased was bound to exercise, was such care as a man of average prudence would instinctively exercise under like circumstances, or which the instinct of self-preservation would lead him to exercise, would not the error of such instruction as that be apparent? Yet such is the substance of the opinion in *Huntress* v. *Railroad.* The question for the jury is not how the deceased probably acted when governed by his instinct of self-preservation. We

may assume that, if it was alert and alive, and he were not preoccupied, it would admonish him to look in every direction when approaching the crossing; but that does not throw any light upon the question, how he subsequently did act after having been warned by his instinct that he was about to approach a dangerous point.

It frequently happens that travelers upon a highway, when about to cross a railroad track, are guilty of negligence, notwithstanding they are aware that a train is approaching. Their instinct of self-preservation does not come into action at all, and they are governed in their conduct solely by their judgment or by other instincts. Their judgment may be faulty; they may miscalculate the distance of the approaching train, its speed, their distance from the track, and the time necessary to cross; or they may follow the instinct to take the chances. The instinct of self-preservation furnishes them no aid whatever in determining what they do. They may exercise their reason or judgment, or they may follow the insane impulse to run the risk. Sometimes they are surprised at finding themselves immediately in front of an approaching engine, and the instinct of self-preservation drives them into frantic and extraordinary efforts to escape.

But there is in this case an antecedent question, namely, what was the conduct of the deceased before he got into danger? Did he exercise the caution that a man of average prudence ought to exercise under like circumstances? Clearly this is a matter of pure speculation. The instinct of self-preservation must be entirely eliminated from that problem, because granting that it was in full exercise, it does not follow that it came into exercise before the deceased was brought into his peril; that it admonished him in season to give his reasoning faculties an opportunity to act; or, having warned him of his danger, that it then led him to do the things which a man of ordinary prudence would or ought to do under like circumstances. If the doctrine of the instinct of self-preservation has any application here, the only inference that can be drawn from it is that Hardy was aware of the so-called defect of the telltale rather than unaware. That instinct would naturally lead a brakeman, of all persons, to observe the dangers which daily beset him, and therefore not only the means of avoiding them but the adequacy of those means; so that Hardy from that natural instinct must be presumed to have taken note of the relation of the telltale to the bridge, and of its adaptation to the end for which it was constructed. It cannot be argued from to prove ignorance of his approach to the bridge because, according to the plaintiff's theory, Hardy was not aware of his peril, and therefore the instinct was not called into activity.

CHASE, J. Assuming the truth of the evidence (*Bullard* v. *Railroad*, 64 N. H. 27, 30), and construing it most favorably for the plaintiff (*Lyman* v. *Railroad*, 66 N. H. 200), does it conclusively appear that the injury to the deceased was caused by dangers of which he assumed the risk when he entered the defendants' service? Is the evidence so definite and convincing that fair-minded men might not arrive at opposite conclusions in answering this question? Unless it is, it cannot be said that the jury could not properly find a verdict for the plaintiff, and the denial of the motion for a nonsuit must be sustained. *Paine* v. *Railway*, 58 N. H. 611; *Lyman* v. *Railroad*, 66 N. H. 200, 204.

Among the risks which Hardy assumed by entering into the service, were those incident to the performance of his duties in setting cars from a train upon the spur track, of which he was informed, or which ordinary care would disclose to him. *Fifield* v. *Railroad*, 42 N. H. 225; *Nash* v. *Company*, 62 N. H. 406; *Henderson* v. *Williams*, 66 N. H. 405; *Bancroft* v. *Railroad*, 67 N. H. 466. He knew, or by the exercise of such care would have learned, of the following facts affecting the risks of his service at that point: The proximity of the siding to the bridge,— not in feet and inches, but in a general way; the necessity of being upon cars at the bridge when they were moving at a speed of about fifteen miles an hour; the insufficiency of the space between the top of a car and the underside of the bridge to allow him to stand erect; the variation in the space by reason of the different heights of cars; the necessity of taking this variation into account in adjusting the position of the body so as to pass safely under the bridge; the liability to obstruction of one's view by the smoke from the locomotive; the location and general character of the bridge guard; the nature of his duties, and the way in which they should be performed. Fair-minded men could not come to different conclusions in respect to these matters; but there were others to be considered.

If there had been no bridge guard near the bridge, and the deceased had known or ought to have known of this fact, the whole duty of looking out for his safety in passing the bridge would have devolved upon him. The introduction of a guard transferred a part of this duty to the defendants. There being a guard, the risk assumed by the deceased was not that of passing under the bridge without any means for reminding him of its proximity, but that of passing under the bridge protected by a guard such as he knew or ought to have known this one was. He had a right to rely upon the guard to remind him of his approach to danger. Its office was to notify him and other trainmen, by the senses of sight and feeling, that they were about to pass a bridge which would hit them unless they changed their position. The necessity for such a reminder arises from the fact

that trainmen are liable to become absorbed by the immediate duty before them and so lose consciousness for the moment of their proximity to danger. To accomplish the object in view, the guard should be some device that will hit some portion of the body when the head is above the plane of the under surface of the bridge, not for the purpose of furnishing a gauge by which to adjust the position of the body, but for the purpose of calling attention to the proximity of danger in and above that plane. The statute provides that the character and location of guards shall be approved by the board of railroad commissioners. P. S., c. 159, s. 26. It did not appear that the commissioners had acted on the subject, at the time of the deceased's injury. The question of suitableness of the guard, in character and location, was therefore to be determined by the jury. It cannot be said, as a matter of law, that it was suitable. The jury might find that the lower ends of the wires should be as low, at least, as the level of the under surface of the bridge timbers, so that they would give warning whenever any portion of the body was above that level.

It is evident that a bridge guard properly constructed and located will not always perform its office, and does not wholly remove the risk of injury from overhead obstructions. A man may thoughtlessly go upon a car as he is passing under the guard or between it and the obstruction, however suitable the character and location of the guard may be, and receive no warning from it. The risk of doing this is incident to the service. To avoid it, a duty rests upon the man to use his sense of sight when about to go upon a car, to ascertain whether he has passed the guard. Whether Hardy stepped on to the car before or after passing the guard, was a question of fact. The evidence bearing upon it is not so positive and convincing as to remove all doubt. The fireman thinks he had got on the car before passing the guard; but his testimony seems to be an inference drawn from other facts, instead of positive recollection. Some fair-minded men might agree with him, while others might come to the opposite conclusion. If he got upon the car before passing the guard, he was at liberty to rely upon it to warn him by the sense of touch of his approach to danger, unless the guard was unsuitable in location or character for that purpose, and he knew or ought to have known of its unsuitableness. While it may be safely said that he knew or ought to have known of its location in reference to the bridge, the evidence does not conclusively show that he knew or ought to have known of the difference in elevation between the ends of the wires and the under surface of the bridge timbers. This fact may not have been—probably was not—ascertainable except by actual measurements or a sighting from one object to another under more

favorable circumstances than was possible when the person was upon the top of a freight car in motion attending to other duties. Upon the evidence, the jury might find that Hardy mounted the car before reaching the bridge guard, and supposing its wires depended as low, at least, as the underside of the bridge timbers, relied upon it to warn him if his head got above that level; that at the moment of passing the guard his head happened to be below the level, and he did not raise it higher before reaching the bridge; and that, receiving no warning, he understood he was below the danger level. It is no answer to say that the jury might find the other way. Fair-minded men upon considering and weighing the evidence might come to different conclusions on this point, but, as has been seen, this does not shift the duty of deciding the question from the jury to the court. These considerations show that the motion for a nonsuit was properly denied. It follows that the defendants' motion at the close of the evidence, for judgment in their favor, was also properly denied.

*Exceptions overruled.*

PARSONS, J., did not sit: the others concurred.