Strafford,
June, 1899.

## RICKER *v.* HALL *& a.*

Directors of a bank are not made liable, as a matter of law, for defalcations of a cashier by knowledge of his prior indulgence in unsuccessful speculation.

BILL IN EQUITY, by a stockholder of the Dover National Bank, to hold the defendants, who were directors of the bank, personally liable for a loss occasioned by the defalcation of the cashier. Facts found by the court.

The Dover National Bank did business in Dover until January 11, 1895, when it suspended by reason of the defalcation of the cashier. Prior to 1880 and until February 23, 1885, one

Hale was cashier and at the same time treasurer of the Dover Five Cent Savings Bank. During this period he employed one Abbott as his clerk and bookkeeper in both banks, paying him about $1,200 a year. From February, 1885, until the failure of the bank, Abbott was cashier of the national and treasurer of the savings bank, receiving from both about $2,700 a year, and paying two clerks from the amount he received. During a portion of this time he was treasurer of the city and of various organizations. The defendants, or the persons whose estates they represent, were directors of the national bank during a part of the time Abbott was employed there. None of them were expert bookkeepers. The business of both banks was conducted in the same banking rooms and over the same counter, but each had a separate safe in which to keep its books and securities.

In 1893, the savings bank was examined by the bank commissioners, and the deposits were reduced twenty-five per cent by order of court, on account of losses. At the time of the failure of the national bank, the savings bank went into the hands of an assignee.

There was a shortage in the national bank, at the time it closed, of $103,000, caused by Abbott's defalcation. This defalcation began before he was cashier, but it was impossible to determine how much it was at any other time. It was concealed at times by false entries made by Abbott in the books of the national bank of the amounts of the deposits made with it by the savings bank and the city, and of the national bank's deposit with a bank in Boston. He at times increased the note account by false entries of discounts, and afterward reduced the account to its proper amount by false entries of notes paid. The notes discounted by the directors were numbered, and were referred to on the books by their numbers. The false entries of notes discounted and paid had no numbers, and appeared only on the daily balance book, on which no names appeared. The directors, in all their dealings, referred to the notes by name and not by number. At the close of the several years, 1889 to 1893, Abbott's deposit as city treasurer with the national bank was less than the balance due the city, according to his account as city treasurer, by sums varying from $5,000 to $40,000. It did not appear that any of the directors were city officials at these times, or knew of these discrepancies.

In 1881, two of the directors, Benn and Wyatt, with Abbott, Hale, and others, borrowed from the national bank $11,000 upon their notes, which were discounted by the directors in the usual way. The proceeds were credited to Benn, and with them the signers speculated in stocks and lost heavily. These notes remained in the bank for some years, and were gradually paid.

At the same time, Abbott borrowed $2,500 from the savings bank upon a mortgage of his house, and shortly afterward he, with Benn and others, borrowed $8,000 from the same bank, for the same purpose, upon good notes which have been paid. At the time Abbott borrowed the $2,500, the books of the national bank showed that the savings bank had overdrawn its account. Abbott's share of the loss on these speculations was about $4,000. It did not appear that any of the directors knew of these speculations, except Nealley and those engaged therein.

While Abbott was cashier, he built a house costing from $15,-000 to $20,000, but he informed the directors that his wife had inherited $70,000, and that the house was built with her money. This was the general understanding in the community. Neither Abbott nor his wife made deposits with the national bank.

The national bank was examined as required by law by the bank examiner, and the savings bank by the bank commissioners. None of them discovered anything wrong with either bank until the final examination of the national. None of them criticised the methods of business in the banks, or called the attention of the officers to anything wrong, but complimented them upon Abbott's bookkeeping and business methods. Neither did the bank clerks discover or suspect anything wrong in the accounts of either bank.

The directors met regularly each week and performed their duties in regard to discounting notes, purchasing securities, and passing upon other matters coming before the board. The notes and securities which the bank had at the time of its failure were found intact, and included no more poor paper than is usual in a similar list. There were no loans to directors in excess of the amount allowed by law, and none which were not paid. The directors, through a committee from their number, examined the bank twice a year, at the same time when a committee from the savings bank examined that institution. They conducted their examinations in the way in which such banks are usually examined. All the directors who are charged with negligence served at times on the examining committee. At many of the times when these examinations were made, there was a discrepancy between the savings bank balance, as shown by its cash book, and the books of the national bank, but the committee never discovered it. Abbott returned the usual sworn statement to the comptroller of the currency, certified by three directors. All the directors at various times certified to these statements, which showed the condition of the bank as it appeared on the books, but not the actual condition. At some of the times when these statements were made, the entries on the books were falsified so as to show a wrong balance due the savings bank, but the directors did not discover the fact.

Abbott's reputation for honesty and truthfulness was excellent. He was a skillful bookkeeper and accountant. All the directors had the fullest confidence in him. None of them concealed or knew of the defalcation, or suspected Abbott of wrong-doing, or that there was anything wrong with the bank until after its failure.

Upon these facts the court found that the directors exercised due care in the management, direction, and control of the bank. To this finding the plaintiff excepted.

*Hayes & Burr* (of Massachusetts), for the plaintiff.

*John S. H. Frink, John Kivel, William F. Nason, Frank F. Fernald, Hall & Hall*, and *Arthur G. Whittemore*, for the defendants.

PEASLEE, J. The question of the existence of negligence is one of fact, and the correctness of a finding upon such a question will not be reviewed here, except so far as to determine whether there was any evidence upon which a reasonable man might reach the conclusion arrived at. *Hardy* v. *Railroad*, 68 N. H. 523. The trier of facts having found that the charge of negligence was not proved, the only question here is whether the evidence was so overwhelming that every reasonable man must have come to a different conclusion.

The decisions in other jurisdictions, attempting to establish inflexible rules whereby it shall be settled that the existence of certain facts establishes a charge of negligence as a matter of law, are not entitled to the weight to which they would be if such views of the law prevailed in this state. The question of negligence, being here regarded as one of fact, is to be determined in the light of all the circumstances peculiar to the particular case. A certain fact, set in the midst of one kind of surroundings, may have a very different probative effect from what it would have with different surroundings.

The claim made in this case is, that the fact that a person has at some time — no matter how remote — indulged in speculation to any extent, great or small, is sufficient to make all who subsequently employ him in a trust capacity, knowing of the speculation, liable for his defalcations in the employment. However great the care taken to supervise his conduct, and however many and convincing the surrounding circumstances tending to show the reasonableness of the employment, they are all to be disregarded, because this branch of the law of negligence has been developed into a fixed formula. No such rule as this has been established in this state. Nor is the rule here stated broader than it must be if the plaintiff's claim is to be sustained. If remoteness of time may be so great as to make the

question a debatable one, to be decided as a fact, the fourteen years that elapsed between Abbot's speculations and the time when it was discovered that he was an embezzler, and during which he apparently led a correct life, must be sufficient for that purpose. If the amount may be a material fact to be considered, the evidence that Abbott's known losses were only about $4,000 would seem to take this case out of the operation of the rule by which it is sought to make the question one of law. These facts, taken in connection with the others reported, show that the question involved was one to be determined at the trial term.

*Exception overruled.*

WALLACE, J., did not sit: the others concurred.